UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Leonard Montour</u>,
    Petitioner

    v.                         Case No.  11-cv-369-SM
                                       Opinion No. 2012 DNH 30
<u>Larry Blaisdell, Warden</u>,
<u>Northern N.H. Correctional Facility</u>,
    Respondent

## O R D E R

In November of 2008, Leonard Montour was convicted of two counts of Aggravated Felonious Sexual Assault, four counts of Felonious Sexual Assault, and two counts of Misdemeanor Sexual Assault on his former babysitter.  He was sentenced to serve 15 to 30 years in prison and his convictions were affirmed on appeal to the New Hampshire Supreme Court.  <u>State v. Montour</u>, Case No. 2009-0313 (N.H. Sept. 14, 2010) (document no. 1-5).

Montour now seeks federal habeas corpus relief, asserting that he was deprived of his Fourteenth Amendment right to due process and his Sixth Amendment right to confront his accuser. <u>See generally</u> 28 U.S.C. § 2254.  The State moves for summary judgment.  For the reasons discussed below, the State's motion is granted.

## Standard of Review

As Montour acknowledges in his memorandum, and as this court has previously noted, the burden on a petitioner seeking federal habeas corpus relief is substantial.  Since passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), the power to grant federal habeas relief to a state prisoner with respect to claims adjudicated on the merits in state court has been significantly limited.  A federal court may not disturb a state conviction unless the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  And, a habeas petitioner seeking relief under that provision faces a substantial burden insofar as "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).

Alternatively, habeas relief may be granted if the state court's resolution of the constitutional issues before it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  See generally Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  To prevail on such a claim, the habeas petitioner

2

must demonstrate that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011).

Only as to federal claims that were presented to the state court but neither adjudicated on the merits nor dismissed by operation of a regularly-applied state procedural rule, may this court apply the more petitioner-friendly de novo standard of review. See, e.g., Clements v. Clarke, 592 F.3d 45 52 (1st Cir. 2010) ("In contrast, a state court decision that does not address the federal claim on the merits falls beyond the ambit of AEDPA. When presented with such unadjudicated claims, the habeas court reviews them de novo.") (citation omitted).

With those principles in mind, the court turns to Montour's petition and the State's motion for summary judgment.

## Background

Montour's first trial ended in a mistrial, after the jury declared it was deadlocked and unable to reach a verdict.  Prior to the retrial, Montour's girlfriend, Jennifer Scott, reported to Manchester police that the couple had received harassing phone

calls on Montour's cellular telephone.  She told police she
suspected the calls had been made by Montour's victim.  She also
reported that she had been awakened late at night by the sound of
a woman screaming outside, followed by tires screeching - an
event she believed was related to the harassing phone calls.
And, finally, Ms. Scott told police she was concerned about a
photograph on the victim's MySpace page that showed her holding a
firearm.

Manchester police investigated the incidents and interviewed
Montour's victim.  When police initially contacted her by
telephone, the victim denied making any calls to Montour's cell
phone.  Subsequently, however, she met with the investigating
officer, admitted she had placed the phone calls to Montour, but
said she couldn't remember how many times she had called him.
She vehemently denied making any threats or acting with the
intent to harass him and told the investigating officer she would
be willing to "swear to this under oath and take a lie detector
test."  Incident/Investigation Report (document no. 1-8) at 13.
She said her phone was "on mute the whole time," told the officer
she was afraid of Montour, and asked, "why would I threaten him?"
Id.

The victim explained that although she originally told prosecutors she was not willing to go through the ordeal of a second trial, she changed her mind and wanted to let Montour know that "she wasn't going to back down." Id.  She denied calling him repeatedly, but suggested that her phone might have done so without her knowledge - that is, she reported that sometimes when she put her phone away, it would redial the last outgoing number that she had called.  The investigating officer noted that her son had the same phone and had experienced the same issue.  In her report, the officer observed that, "[t]his would explain the back-to-back calls" that Ms. Scott had reported.  Id.

The investigating officer also asked the victim whether she had a MySpace page and, if so, whether she had posted any photographs of her posing with firearms.  The victim admitted having a MySpace page but said she couldn't remember any photographs involving firearms.  But, "[a]fter thinking about it briefly, she stated there was a picture of her doing some target shooting with a BB gun," at her boyfriend's home in Maine.  Id. at 4.  She showed the officer the photograph in question, told the officer she had nothing to hide, and offered to allow the officer to inspect her computer.

Meanwhile, Montour and his girlfriend were not terribly cooperative with the investigation.  See id. at 3.  Eventually, the investigating officer told the victim's parents that she "did not foresee charges being brought against [the victim] in this case due to lack of evidence and the fact that [the officer] had some doubts about Jennifer Scott's and Lenny Montour's credibility."  Id. at 4.

Prior to his retrial, Montour filed a motion seeking copies of the investigative report (because the police investigation was still ongoing at the time, the contents of the investigative file were not yet public).  That motion was denied initially and, after the trial court reviewed the report in camera, again on reconsideration.  Montour was eventually retried and convicted on all eight counts.  Subsequently, he obtained a copy of the report and discovered that the victim had made the allegedly harassing calls and, when questioned about those calls, she initially denied making them.

### Discussion

As construed by the Magistrate Judge, Montour's petition for habeas corpus relief raises two claims:

1. Montour suffered a violation of his right to due process under the Fourteenth Amendment when the trial judge, after conducting an in camera review,

6

       denied Montour's request for disclosure of police
reports showing that the complaining witness had
lied to the police.

2.    Montour suffered a violation of his Sixth
Amendment right to confrontation when the trial
judge restricted his cross-examination of the
complaining witness regarding a matter relating to
her bias, motive to fabricate, and general
credibility.

Report and Recommendation (document no. 2) at 4.  The State

asserts that those claims are both unexhausted and procedurally

defaulted.  Montour, on the other hand, says those claims were

fully and fairly presented to the New Hampshire Supreme Court and

neither was resolved against him on state procedural grounds.

And, because the state court failed to address (or even allude

to) his federal constitutional claims, Montour says he is

entitled to de novo review of them in this forum.


    Even giving Montour the benefit of the doubt, assuming he is

correct, and subjecting his constitutional claims to de novo

review, he is not entitled to the relief he seeks.


I.   <u>Petitioner's Due Process Claim</u>.

    Montour asserts that the State's failure "to disclose the

police report to [him] which contained evidence that the victim

had lied to the police during a subsequent investigation"

violated his constitutionally protected right to due process.

Petitioner's memorandum at 17.  More specifically, Montour says
he could have used evidence that the victim lied to police to
impeach her credibility.

It is well-established that the suppression "of evidence
favorable to an accused upon request violates due process where
the evidence is material either to guilt or to punishment."
Brady v. Maryland, 373 U.S. 83, 87 (1963).  See also Giglio v.
United States, 405 U.S. 150, 154 (1972) ("When the reliability of
a given witness may well be determinative of guilt or innocence,
nondisclosure of evidence affecting credibility falls within this
general rule.") (citation and internal punctuation omitted).
But, evidence is material "only if there is a reasonable
probability that, had the evidence been disclosed to the defense,
the result of the proceeding would have been different.  A
'reasonable probability' is a probability sufficient to undermine
confidence in the outcome."  United States v. Bagley, 473 U.S.
667, 682 (1985).  See also Kyles v. Whitley, 514 U.S. 419, 434
(1995); Banks v. Dretke, 540 U.S. 668, 699 (2004).

When assessing the "materiality" of evidence, the court must
consider not only the potentially expulpatory or impeaching
nature of that evidence, but also the effect such evidence likely
would have had on the jury, in light of all the evidence

presented at trial.  In other words, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." Kyles, 514 U.S. at 436-37.  Both the nature of the evidence in question and the context in which defendant might have employed it are relevant.  See, e.g., Bagley, 473 U.S. at 675 n.7 ("[A] rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments.").

Montour argues that, had the jury known that the victim initially denied making any phone calls to him, and had it been aware of her willingness to "lie" to police officers, "the jury would have [had] a different impression of her and her bias and infatuation towards him and [such evidence would have] demonstrate[d] her motive to fabricate a relationship." Petitioner's memorandum (document no. 11) at 16.  The court disagrees.  Given all the evidence introduced at trial, and in light of the timing of the victim's lie to police, the potential impeachment value of the police report in question was, at best, minimal.  Viewed in context, its exclusion from Montour's trial - though arguably improper - does not undermine confidence in the jury's verdict.

First, the timing of the allegedly harassing phone calls and the victim's lie to the police is important.  As the trial court suggested in its order denying Montour's motion for discovery (document no. 1-6), because those events occurred after Montour's first trial and shortly before his re-trial, they had minimal potential probative value.  Had the allegedly harassing phone calls and the lie to police been made before charges were filed against Montour, or even before his first trial, the police report would have had fairly significant impeachment value.  It could have plausibly suggested to the jury that the victim was infatuated with Montour, angry that he rejected her advances and, conceivably, had a motive to fabricate the charges against him out of spite.[1]

---

[1]     Parenthetically, the court notes that Montour never advanced such a theory in his defense.  Montour himself offered no explanation for why the victim might have lied about the events leading to his convictions.  In fact, when asked why she might have fabricated those events, Montour testified "I just don't know why.  I don't know why."  Trial transcript vol. 3, at 519-20.  Similarly, Montour's counsel never advanced the infatuation/rebuffed advances/spite theory for why the victim might have falsely accused Montour.  Rather, in his closing argument, counsel offered two different theories.  First, he posited that the victim was upset at Montour's girlfriend for refusing to allow her to babysit Montour's children any longer.  So, she fabricated stories of Montour having assaulted her as an indirect way to get back at Montour's girlfriend.  Alternatively, counsel argued that the victim fabricated the incidents with Montour to explain why she began suffering social and emotional problems.  Trial transcript vol. 4, at 624-25.

But, the events that were the subject of the investigative report occurred well after charges had been filed against Montour and, in fact, after Montour's first trial ended in a hung jury - thus giving rise to an equally plausible (if not more plausible) inference for the jury to draw: the victim was, as she told the police, angry with Montour for having raped her and angry that she would have to endure a second trial, but sufficiently frightened of him to remain silent when she placed the calls to Montour's phone (or, as she told police, to keep her phone on "mute").

Even more to the point, Montour's trial counsel effectively cross-examined the victim at length about her credibility and potential bias, pointing out both factual omissions and contradictions in her trial testimony on several occasions.  <u>See, e.g.</u>, Petitioner's appellate brief to the New Hampshire Supreme Court (document no. 1-3) at 4-17 (summarizing various discrepancies between the victim's testimony and her earlier reports to the police with regard to, for example, the "initial incident in Litchfield," the "shower incident," the "bedroom incident," the "sunbathing incident," the "Victoria's Secret incident," the "basement incident," and the "Harley Davidson truck incident.").  Notwithstanding those discrepancies, the jury obviously found the substance of the victim's testimony credible

beyond a reasonable doubt.  That she initially told police "that she didn't call anyone," Incident/Investigation Report at 13, was of only slight additional impeachment value - particularly when the report makes clear that, shortly after her initial denial, the victim admitted to making the calls, explained (in a manner the investigating officer found credible) both why she made them and the reason for the "back-to-back" calls, gave the officer access to her phone, and offered to allow the officer to search her computer.

As noted earlier, allowing discovery and examination might have been the preferable course, but when viewed in the context of all the evidence introduced at trial - particularly similar evidence used to undermine the victim's credibility - it is clear that the police report was not "material."  In other words, there is not a reasonable probability (i.e., one sufficient to undermine confidence in the outcome) that, had the report been disclosed to the defense and examination allowed, the result of Montour's criminal trial would have been different.  Accordingly, the trial court's decision to deny Montour access to that report did not violate his federal constitutional right to due process.

II.   Petitioner's Confrontation Clause Claim.

     In a related claim, Montour asserts that the "trial judge
violated the Confrontation Clause of the Sixth Amendment to the
United States Constitution by preventing [him] from cross-
examining the victim about the harassing telephone calls she made
to him and his fiancee."  Petitioner's memorandum at 13.
According to Montour, the "entire case against [him] was based on
the credibility of the victim and the jury would have [had] a
different impression of her if they knew that subsequent to the
trial, she made harassing phone calls and initially denied it to
the police."  Id. At 14-15.


     The Supreme Court has held that a criminal defendant "states
a violation of the Confrontation Clause by showing that he was
prohibited from engaging in otherwise appropriate cross-
examination designed to show a prototypical form of bias on the
part of the witness, and thereby to expose to the jury the facts
from which jurors could appropriately draw inferences relating to
the reliability of the witness."  Delaware v. Van Arsdall, 475
U.S. 673, 680 (1986) (citation and internal punctuation omitted).
The Court cautioned, however, that:

          It does not follow, of course, that the Confrontation
     Clause of the Sixth Amendment prevents a trial judge
     from imposing any limits on defense counsel's inquiry
     into the potential bias of a prosecution witness.  On
     the contrary, trial judges retain wide latitude insofar

                              13

> as the Confrontation Clause is concerned to impose
> reasonable limits on such cross-examination based on
> concerns about, among other things, harassment,
> prejudice, confusion of the issues, the witness'
> safety, or interrogation that is repetitive or only
> marginally relevant.  And as we observed earlier this
> Term, the Confrontation Clause guarantees an
> <u>opportunity</u> for effective cross-examination, not cross-
> examination that is effective in whatever way, and to
> whatever extent, the defense might wish.

<u>Id</u>. at 679 (citation and internal punctuation omitted) (emphasis

in original).  Interpreting the Supreme Court's holding in <u>Van

Arsdall</u>, the court of appeals for this circuit has stated:

> The first question to be asked under the <u>Van Arsdall</u>
> test is whether the limitation prejudiced the
> examination of that particular witness.  In other
> words, absent the limitation, would the jury have
> received a significantly different impression of the
> witness's credibility?  The second element of the <u>Van
> Arsdall</u> test is whether the error was harmless beyond a
> reasonable doubt; if so, reversal is not warranted.

<u>DiBenedetto v. Hall</u>, 272 F.3d 1, 10 (1st Cir. 2001) (citations

and internal punctuation omitted).


Having reviewed the record, the court cannot conclude that

Montour's cross-examination of the victim was prejudiced by his

inability to confront her with the police report.  First, viewed

in isolation, the impeachment value of that report was, at best,

minimal.  When the investigating officer initially contacted the

victim by telephone and asked whether she had called Montour's

cell phone, the victim said "she didn't call anyone."

Subsequently, however, she and her mother went to the police station and met with the investigating officer.  The victim admitted she had called Montour on her cell phone, and she explained why she had done so.  While counsel might have used the victim's initial "lie" to police officers to undermine her credibility, such a line of inquiry would have been of only minimal practical value - particularly given the fact that, shortly after that initial denial, the victim voluntarily met with the investigating officer, explained her conduct, and offered the officer access to both her phone and her computer.

Second, when viewed in the context of the evidence actually presented at trial - particularly counsel's lengthy and probing cross-examination of the victim - it is apparent that the inability to access the investigative report did not seriously prejudice Montour's examination of her.  In other words, the jury would not have had a "significantly different impression" of the victim if Montour had been allowed to cross-examine her about the fleeting "lie" referenced in the police report.  See DiBenedetto, 272 F.3d at 10.  Montour had a full and fair opportunity to cross-examine the victim - something his counsel did quite effectively - and to develop his argument that the victim lied about the sexual assaults: (a) to explain why she was having various social and emotional problems in her life; and (b) to get

15

back at Montour's girlfriend, whom she allegedly disliked.  <u>See</u>
Defendant's closing argument, trial transcript vol. 5, at 624-26.
<u>See generally</u> <u>Bui v. DiPaolo</u>, 170 F.3d 232, 242 (1st Cir. 1999)
("[T]o the extent that the petitioner is suggesting that a
criminal defendant has license to cross-question a prosecution
witness concerning every conceivable theory of bias, regardless
of the prevailing circumstances, he is plainly wrong.  The
threshold requirement imposed by the Confrontation Clause is
satisfied as long as the defendant is given a fair chance to
inquire into a witness's bias.").

## Conclusion

The trial judge probably should have given Montour access to
the investigative report and permitted him to cross-examine the
victim about the allegedly harassing phone calls.  Nevertheless,
it is plain that the trial court's decision to withhold that
report did not violate Montour's constitutionally protected
rights.  For the foregoing reasons, the respondent's motion for
summary judgment (document no. 6) is granted.  The petition for a
writ of habeas corpus (document no. 1) is denied and the Clerk of
Court shall close the case.

Because Montour has not "made a substantial showing of the
denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the

court declines to issue a certificate of appealability. Petitioner may, however, seek such a certificate from the court of appeals under Federal Rule of Appellate Procedure 22(b).  <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (2010); 28 U.S.C. § 2253(c).

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 30, 2012

cc:  Lisa R. Rick, Esq.
     Andrew R. Schulman, Esq.
     Elizabeth C. Woodcock, Esq.